WICKER, J.,
CONCURS WITH REASONS
|7I agree fully with the analysis and the majority’s conclusion that Mr. Williams’ sentence is not constitutionally excessive. I write separately to highlight the practical and the economic inefficiencies resulting from the decision to multiple bill a non *1199 violent drug offender like Mr. Williams. La. R.S. 15:529.1 places the decision to multiple bill an offender squarely within the discretion of the district attorney. See La. R.S. 15.529.1(D)(1)(a). While the authority to multiple bill an offender may prove a very useful tool to prolong the incarceration of a dangerous offender, according to the PEW Charitable Trust, that authority is most often used to prolong the incarceration of those whose most serious offense is a conviction for a drug offense or a property offense. Indeed, for nearly three-fourths of those sentenced under La. R.S. 15:529.1 in 2015, their most serious convictions were drug or property offenses. Only 14% of those sentenced under La. R.S. 15:529.1 had a violent crime conviction. In the instant case, Mr. Williams has never been arrested for or convicted of a crime of violence. There is no evidence in the record that the State suspected Mr. Williams of committing such a crime. Although it may not be immediately obvious as La. R.S. 15:529.1 itself only limits sentencing benefit eligibility and eligibility for political office, a habitual offender conviction carries with it serious collateral consequences that can have a profound impact on the State’s ability to rehabilitate offenders and to facilitate their successful reentry into the community. In an effort to encourage more cost-conscious . decision-making in this area, I will outline the obstacles to rehabilitation • that Mr. Williams—who was billed as a second felony offender with two possession of heroin convictions—is subject to as a result of his conviction under La. R.S. 15:529.1.
| «The most obvious consequence of a conviction under La. R.S. 15:529.1 is the increased sentencing range to which Mr. Williams is subject. Upon his conviction for possession of heroin, in violation of La. R.S. 40:966(0), Mr. Williams received the maximum sentence of ten years at hard labor. Thereafter, the State filed a multiple offender bill of information, alleging that Mr. Williams was a second felony offender with a 2004 conviction for possession of heroin. As a result of his conviction under La. R.S. 16:529.1(A)(1), the statute required the'district court to-sentence the habitual offender to “a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.”[3] Accordingly, Mr. Williams faced a sentencing range between five years and twenty years at hard labor, without benefit of probation or suspension of sentence. The district court sentenced Mr. Williams to the maximum sentence of twenty years at hard labor without .benefit of probation or suspension of sentence. Thus, as a consequence of his habitual offender conviction, Mr. Williams received a sentence that was twice as long as the sentence he would have received if the State had not multiple billed him. Pursuant to recent amendments to La. R.S. 15:574.4 which will beeomé effective. on November 1, 2017,[4] Mr. Williams will become parole eligible after serving twenty-five percent of his sentence. Acts 2017, No. 280. If Mr, Williams is never granted parole, he will not be released from prison until June 27, 2035, when he will be sixty-two years of age.
Unfortunately, this is not a zero sum game either for the State or for Mr. Williams. Incarcerating Mr. ■ Williams— whose three felony convictions have all *1200 concerned possession of narcotics—is costly. According to the Department of Corrections, it currently costs $24.39/day to house an offender. Per year, that is 19a cost of $8,902.35. The cost to imprison Mr. Williams for twenty years will be approximately $178,047. That total does not include any additional costs, such as Mr. Williams’ healthcare needs as he ages behind bars. Given this State’s budget crisis, prolonged incarceration of a non-violent offender like Mr. Williams, whose latest arrest resulted from possession of three grams of heroin, would seem to be fairly low on the State’s list of priorities.
While the State bears high costs for incarcerating Mr. Williams, it does not seem to reap even roughly equivalent concomitant benefits. Since at least 1993, Mr. Williams has had drug problems. Under these circumstances, it is not likely that a prolonged term of imprisonment accomplishes much in the way of deterrence. Indeed, on the margin, the risk of a lengthy prison sentence is unlikely to deter a multiple drug offender ex ante—that is, at the time he makes the decision to possess drugs. If Mr. Williams is an addict, as it appears he is based on his criminal record, his demand for drugs is relatively inelastic.[5] As such, he will seek to possess drugs even at increased personal cost (i.e., even if he faces the risk of more severe criminal penalties). Thus, at the moment Mr. Williams is making this decision, the risk of a twenty-year prison sentence, as opposed to a ten-year prison sentence, is unlikely to effectively deter him from engaging in this undesirable behavior. While the community does obtain some satisfaction from incarcerating those who break its laws, this satisfaction would seem to be nominal in the case of drug offenders whose drug use causes them to repeatedly victimize themselves.
Because Mr. Williams will conceivably be released from prison one day, the State does have an interest in rehabilitating him and facilitating his reentry into society. The Legislature explicitly expressed the State’s interest in | ^rehabilitating the incarcerated in La. R.S. 15:828(A)(1) which provides in pertinent part,
Persons committed to and in the physical custody of the department shall be treated in a humane manner, and the department shall direct efforts toward the rehabilitation of such persons in order to effect their return to the community as promptly as practicable.
To facilitate rehabilitation and reentry, the Legislature has created numerous programs and initiatives aimed at incentiviz-ing offenders to develop the habit of living by the rules while in prison and to obtain the education and the skills needed to succeed once they are released. Nevertheless, despite the State’s interest in rehabilitating offenders, the Legislature has barred those who have been convicted as habitual offenders under La. R.S. 15:529.1 from participating in many of these programs. For example, La. R.S. 15:571.3(B)(1)(a) provides a felony offender, “[u]nless otherwise prohibited,” with the opportunity to earn “diminution of sentence by good behavior and performance of work or self-improvement activities, or both, to be known as ‘good time.’” If eligible to receive good time, an inmate may earn diminution of his sentence at “the rate of one and one half-day for every one day in actual custody served on the imposed sentence.”[6] However, if an offender has been *1201 convicted as a habitual offender under La. R.S. 15:529.1, La. R.S. 15:571.3(C)(1) limits the amount of good time he may accrue and the manner in which he may earn it. While most other offenders can also earn good time for their good behavior, habitual offenders cannot. Those convicted as multiple offenders under La. R.S. 15:529.1 may only earn up to 360 days of good time for participation in certified treatment and rehabilitation programs, which may include basic education, job skills training, values development and faith-based initiatives, therapeutic programs, and treatment programs. La. R.S. 15:571.3(E), 15:828(B). The opportunity to [^receive behavior-related good time provides a significant incentive to those who are eligible to receive it to improve themselves and to develop the habit of living in an ordered manner. Unfortunately, a habitual offender conviction denies an inmate this important and valuable behavioral incentive.
Similarly, as a convicted habitual offender, Mr. Williams is also barred'from participating in the Workforce Development Sentencing Program pursuant to La. R.S. 13:5401(b)(1)(f). This relatively new and innovative program provides eligible offenders with educational and vocational train-mg, moral rehabilitation, basic social and life skills, and community and faith-based support systems to help facilitate their reentry into society. By virtue of his habitual offender conviction, Mr. Williams is also barred from participating in work release programs until “the last year of his term.” . La. R.S. 15:1111.[7] Because Mr. Williams will be parole eligible after he serves twenty-five percent of his sentence, this means that, if the Louisiana Board of Pardons & Parole decides to parole Mr. Williams earlier than one year from the time he becomes full term, Mr. Williams may never become eligible to participate in work release programs because of his habitual offender status.[8] This program serves to help offenders accumulate some kind of financial cushion to fácilitate their reentry into the community. The law inanely limits the degree to which those most likely to recidivate may take advantage of this benefit. Although the Legislature established both the Workforce Development Sentencing Program and work release programs to help offenders gain meaningful and transferable job skills that may help them obtain employment upon their release, habitual offenders—| igthose who are most likely to need this help—are further handicapped because the law limits their access to these important programs.[9]
*1202 As taxpaying members of an ordered society, we pay to incarcerate individuals as punishment for their crimes, and we demand that offenders turn their lives around such that they can once again join the community of contributing members. However, the collateral ’consequences attending a habitual offender conviction extend the time of incarceration—and, therefore, the amount of taxpayer dollars spent—but limit the tools the offender has at his disposal to successfully reenter the community upon release. While La. R.S. 15:529.1 places the discretion to multiple bill solely within the hands of the district' attorney, given the high cost of incarceration, the low impact on deterrence, and the limitations it places , on access to rehabilitation programs, restrained, limited, and thoughtful exercise of that discretion would seem to best promote justice, the public interest, and the offender’s prospects for. successful reentry.

. Effective November 1, 2017, the Legislature has shortened the sentencing range for a second felony offender to “one-third the longest term and not more than twice the longest term prescribed for a first conviction.” Acts 2017, No. 282.

. Prior to these amendments, La. R.S. 15:574.4(A)(1)(a) denied parole eligibility to Mr. Williams because he has been convicted of three felonies, all of which are drug related.

. See Henry N. Butler et al., Economic Analysis for Lawyers 420 (3d ed. 2014).

. Effective November 1, 2017, the rate at which an inmate may earn good time will increase to thirteen days for every seven days in actual custody on the imposed sentence. Acts 2017, No. 280, § 3.

. La. R.S. 15:1111 governs work release programs established and administered by the Department of Corrections. This statute limits a habitual offender's work release eligibility to the “last year of his term.” In contrast, La. R.S. 15:711 governs work release programs established and administered by the sheriff in each parish. This statute limits habitual offenders' work release eligibility to the "last six months of their terms.” Thus, prisoners in parish custody have an even shorter window during which they may be eligible for work release participation.

. As a practical matter, the Board of Pardons & Parole will often hold a parole hearing six months before the offender becomes parole eligible. If the Board grants parole, it will then often set a parole release date six months after the parole hearing such that a habitual offender may at least take advantage of six months of work release.

.As Butler, Drahozal, and Bailey point out, “Serving time in jail may reduce legal opportunities so that the opportunity cost of future criminal activity is lower.” Butler et al., supra, 386. This point is important and makes sense. Based on the economic model of rational choice, the degree to which an offender is likely to recidivate depends heavily on the alternatives to criminal behavior available to him such that the opportunity cost of criminal behavior is higher. Work release programs are an effective rehabilitation measure because they expand these legal alternatives. Given the damage a single felony conviction does to one’s job prospects outside the prison walls, it makes no sense to limit a habitual offender’s access to job programs within the *1202 prison walls which may help increase the opportunity cost of future criminal activity and to decrease his desire to recidivate.